# UNITED STATES DISTRICT COURT

for the

Southern District of California ▼

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Purple iPhone Seizure No. S001731741 Found in<br>the possession of Brenda SILVA ("Target Device 1") | )<br>)<br>)<br>)<br>)<br>) |

Case No.   **24-mj-03514**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See attachment A, which is incorporated herein by reference

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See attachment B, which is incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. 841(a)(1), 843(b), 846, 952, 960, 963; 18 USC 1956-57 | Importation and distribution of federally controlled substances and conspiracy to commit the same; money laundering and conspiracy to do the same |

The application is based on these facts:

See attached affidavit of Jonathan Corrao, Task Force Officer employed by the San Diego Sheriffs Office, assigned to the DEA, which is incorporated herein by reference

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Jonathan Corrao*
*Applicant's signature*

Jonathan Corrao, Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: September 13, 2024

*Benjamin Cheeks*
*Judge's signature*

City and state: San Diego, California

Benjamin J. Cheeks
*Printed name and title*

## ATTACHMENT A

### *Property to be Searched*

The following property is to be searched:

> Purple iPhone
>
> Seizure No. S001731741
>
> Found in the possession of Brenda SILVA
>
> ("Target Device 1")

> Black iPhone
>
> Seizure No. S001731778
>
> Found in the possession of Rudy TRUJILLO
>
> ("Target Device 2")

which are currently in the possession of the Drug Enforcement Administration (DEA) San Diego Field Division (SDFD) office located at 4560 Viewridge Avenue, San Diego, CA 92123.

## **ATTACHMENT B**

### *Items To Be Seized*

Authorization to search the cellular telephones described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below.  The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of April 1, 2022, up to and including March 22, 2023:

    a.    tending to identify attempts to import and/or distribute controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses;

    b.    tending to identify the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offense;

    c.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation and/or distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses;

    d.    tending to identify co-conspirators, criminal associates, or others involved in the importation and/or distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses;

    e.    tending to identify travel to or presence at locations involved in the importation and/or distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United

States and Mexico and/or conspiracy to commit said offenses; such as stash houses, load houses, or delivery points;

f.     tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

g.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above

which are evidence of violations of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 952, 960, 963 and Title 18, United States Code, and Sections 1956-1957.

## <u>AFFIDAVIT</u>

I, Jonathan Corrao, Task Force Officer, being duly sworn, hereby state as follows:

### INTRODUCTION

1.     I submit this affidavit in support of an application for warrants to search the following electronic devices, (collectively, the "Target Devices"):

> Purple iPhone
>
> Seizure No. S001731741
>
> Found in the possession of Brenda SILVA
>
> ("Target Device 1")
>
> Black iPhone
>
> Seizure No. S001731778
>
> Found in the possession of Rudy TRUJILLO
>
> ("Target Device 2")

as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 952, 960, 963 and Title 18, United States Code, and Sections 1956-1957 ("Target Offenses") as further described in Attachment B.   The requested warrant relates to the investigation and prosecution of Brenda SILVA (SILVA) and RUDY TRUJILLO (TRUJILLO) for conspiracy to distribute methamphetamine and distribution of methamphetamine and fentanyl, both Schedule II Controlled Substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.   The Target Devices are currently stored as evidence at the Drug Enforcement Administration (DEA) San Diego Field Division (SDFD) office located at 4560 Viewridge Avenue, San Diego, CA 92123.

2.     The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the

Target Devices, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I am a Task Force Officer (TFO) employed by the San Diego Sheriff's Office (SDSO), assigned to the DEA and I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code. I am empowered by law to conduct investigations and to make arrests for felony offenses.

4. I started my career in law enforcement with the El Centro Police Department in May 2011. In May 2014, I lateralled to the El Cajon Police Department. While there, I was assigned to the Patrol Division, Gang Suppression Team, and Special Weapons and Tactics. In April of 2018 I lateralled to SDSO. While with SDSO, I have been assigned to the Patrol Division, Crime Suppression Team, and Area Investigations. In April 2021, I was sworn as a DEA TFO and was assigned to DEA SDFD.

5. While with the DEA, I have participated in multiple investigations targeting individuals and drug transportation organizations (DTOs) for: the unlawful importation, manufacture, and distribution of controlled substances; and/or conspiracies associated with unlawful narcotics related offenses. More specifically, these investigations have involved conducting surveillance, executing search warrants, seizing controlled substances, and narcotics-related assets and making arrests for controlled substance violations.

6. I am currently assigned to the DEA SDFD San Diego County Integrated Narcotics Task Force (NTF) Team 1 and have been since April 2021. NTF Team 1 investigates U.S. and foreign based individuals and drug trafficking organizations involved in the distribution of wholesale quantities of controlled substance including: heroin, fentanyl, methamphetamine, cocaine, and marijuana in and around the San Diego, CA area.

7. I am aware that it is a common practice for narcotics traffickers to use multiple cellular telephones, pagers, portable radios, tablets, computers and other electronic devices containing photographs, ledgers messages, contacts, emails, documents, and other forms of correspondence to maintain communications with co-conspirators in furtherance of

trafficking activity. Narcotics traffickers routinely switch between multiple cellular telephones and digital devices in order to hinder law enforcement investigative efforts. Traffickers also may subscribe to multiple carrier services for their various phones. Generally, it is common to encounter narcotics traffickers in possession of multiple devices, some of which are use at the same time. It is also common to find evidence in phones not currently subscribed to cellular service. Narcotics traffickers sometimes switch cellular devices but keep the old device that preserves the evidence.

8. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) and other portable electronic devices (such as Laptops, iPads, Tablets, etc.) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones and other portable electronic devices (such as Laptops, iPads, Tablets, etc.) of individuals involved in the importation of narcotics may yield evidence:

    a.    tending to identify attempts to import and/or distribute controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses;

    b.    tending to identify the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offense;

    c.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation and/or distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or

distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses;

d.      tending to identify co-conspirators, criminal associates, or others involved in the importation and/or distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses;

e.      tending to identify travel to or presence at locations involved in the importation and/or distribution of controlled substances and the collection and transportation of bulk cash proceeds from the sale or distribution of controlled substances within the United States and between the United States and Mexico and/or conspiracy to commit said offenses; such as stash houses, load houses, or delivery points;

f.      tending to identify the user of, or persons with control over or access to, the **Target Devices**; and/or

g.      tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above, which are evidence of the **Target Offenses.**

## FACTS SUPPORTING PROBABLE CAUSE

9.      In May 2022, a confidential source (CS-1[1]) identified SILVA and TRUJILLO as individuals selling kilogram quantities of methamphetamine, fentanyl, cocaine, and

---

[1] CS-1 began cooperating with law enforcement in March 2020, but was deactivated in April 2021. During an unrelated DEA operation, CS-1 was unable to control a target's actions during a controlled buy as needed. Specifically, CS-1 permitted the target to control the location of the purchase and walked with the target to an area not discussed with CS-1's handler. After the operation, CS-1 was talked to about the issue and was, from then on, only utilized as a provider of information. However, CS-1 was thereafter deactivated due to health issues. CS-1 again became a source of information in May 2022, and began receiving remuneration for his/her cooperation in October 2022. Other than this remuneration, CS-1 did not receive any other benefits for his/her cooperation.  CS-1 died in 2023 due to a medical condition. CS-1 had the following criminal history: a 1988 felony conviction for intent to manufacture controlled substances; a 1990 felony conviction for possession of a controlled substance with intent to distribute; a 2005 misdemeanor conviction for driving under the influence; a 2006 misdemeanor conviction for possession of a controlled substance; and, a 2019 felony conviction for possession of a controlled substance while armed. Investigators are not aware of any time during CS-1's cooperation with law enforcement when CS-1 has knowingly given false information. Further,

heroin. CS-1 met them through working with SILVA's husband, Erick Barron HERNANDEZ. HERNANDEZ was arrested for importing approximately 86 pounds of methamphetamine in April 2022, pleaded guilty to the same, and was sentenced to 84 months' custody on March 13, 2023. According to CS-1, SILVA and TRUJILLO received and distributed narcotics in HERNANDEZ's absence. On or about June 1, 2022, at the direction of investigators, CS-1 introduced a potential buyer, CS-2,[2] to SILVA.

10.    In August 2022, CS-2 and SILVA engaged in discussions concerning the sale of methamphetamine and M-30 counterfeit Oxycodone pills containing fentanyl ("M-30 fentanyl pills") to CS-2. SILVA used the phone number 619-227-1772, believed to be associated with Target Device 1. During recorded phone conversations, SILVA told CS-2 that she can get "anything" and recently sold powder fentanyl:

> SILVA:      Anything. I just had fentanyl, and I just got rid of it because I don't like to mess with that. That's one thing, the powder, I don't like to mess with that.
>
> CS-2:       I, I like the [M-30 fentanyl] pills. I can move [M-30 fentanyl] pills.
>
> SILVA:      No, I can get [M-30 fentanyl] pills. I can get you some [M-30 fentanyl] pills.

---

much of the information provided by CS-1 has been corroborated by further investigation. Investigators believe that the information provided by CS-1 was credible and reliable.

[2] CS-2 has been cooperating with investigators since October 2021. In 2021, CS-2 was approached by law enforcement after having been identified as an individual who imported multiple kilograms of methamphetamine and cocaine where the target of the investigation was already arrested. CS-2 was not arrested or charged but was advised of potential charges. Due to this, CS-2 cooperated with investigators in consideration that charges not be filed. Beginning in or about January 2023, CS-2 began cooperating for monetary value. Investigators are not aware of any time during CS-2's cooperation with law enforcement when CS-2 has knowingly given false information. Further, much of the information provided by CS-2 has been corroborated by further investigation. Investigators believe that the information provided by CS-2 is credible and reliable.

11.     CS-2 and SILVA met in person on August 9, 2022 to further discuss the sale of narcotics to CS-2. During that recorded and monitored in-person meeting, CS-2 told SILVA he wanted to purchase methamphetamine and M-30 fentanyl pills:

|  |  |  |
|---|---|---|
| CS-2: | This is, this is what I need and maybe, maybe we can do business, ok? I'm looking for M-30s.  I'm looking for M-30s, and I'm looking for aguas [English translation: water, aka methamphetamine]. |
| SILVA: | Ok, I can get it. |
| CS-2: | How much can you get me the aguas [English translation: water, aka methamphetamine] for? |
| SILVA: | Uh, I have to double-check. Just only because it's me and my son-in-law [TRUJILLO]. |

12.     During the meeting, SILVA called TRUJILLO on speaker phone to inquire about pricing for the M-30 fentanyl pills.[3] The following phone call conversation, captured by the audio inside the undercover vehicle ("UCV"), occurred:

|  |  |
|---|---|
| TRUJILLO: | Hello? |
| SILVA: | Hey mijo [English translation: son], do me a favor? |
| TRUJILLO: | What happened? |
| SILVA: | I need a price on M-30's, ten thousand [10,000 pills]. |
| TRUJILLO: | Huh? |
| SILVA: | Huh? |
| TRUJILLO: | What? |
| SILVA: | I need a price… can you hear me? |
| TRUJILLO: | Yeah? |
| SILVA: | Yeah. Did you just wake up? |
| TRUJILLO: | No, not really. [Unintelligible.] |

---

[3] Tolls confirm SILVA called TRUJILLO at (619) 288-0900.

| | | |
|---|---|---|
| SILVA: | No not really! Okay. Okay. I need a price. Okay. Can you hear me? | |
| TRUJILLO: | For? | |
| SILVA: | Ten thousand [10,000] M-30's. | |
| TRUJILLO: | For a whole one [10,000 pills]. A whole one [10,000 pills], a whole one of the M-30's, a whole one of the blues [M-30 fentanyl pills]? | |
| SILVA: | Yes. | |
| TRUJILLO: | Ummm the price, the price is I think uh 8/5 [$8,500]… 8/5, 8/5 for one [10,000 pills]. So that comes out to… yea it comes out ten [unintelligible]. | |
| SILVA: | Okay. Can… | |
| TRUJILLO: | So 8/5, so that's, that's the price for us, so tell him 9/5 [$9,500]. | |
| SILVA: | No no no no no. I need a better price for him… can you call and see what you can do? Uh huh. But its cash up front. | |

13.    SILVA later texted CS-2 that TRUJILLO went "down south" (Mexico) to negotiate pricing for 10,000 M-30 fentanyl pills but cocaine is "20" ($20,000).  Border crossing records reflect that his vehicle crossed southbound into Mexico at 6:58 p.m. that evening, and that Trujillo crossed his vehicle back into the United States on August 10, 2022 at 12:41 a.m.

14.    SILVA and CS-2 spoke again on a recorded call on August 22, 2022. SILVA stated that TRUJILLO is working on getting "samples" (of the narcotics in advance of sale) for CS-2 and she directed CS-2 to call TRUJILLO.

15.    The morning of August 24, 2022, agents met with CS-2 at a predetermined location and equipped CS-2 with audio- and video-recording devices both on CS-2's person and the UCV.  Pursuant to standard procedures, agents performed a search of CS-

2's person and the UCV, which yielded negative results.  Before the meeting, CS-2 texted TRUJILLO a meet location of the Terra Nova Plaza located at 394 East H Street, Chula Vista, California. TRUJILLO responded five minutes later, "I'll arrive in about 25 minutes."  Toll records reflect that, at the same time, TRUJILLO called and spoke with SILVA for nearly three minutes. CS-2 was continually monitored both visually and via audio transmitter as he traveled to the meet location.

16.    At approximately 12:10 p.m., agents observed a 2013 grey Jeep Cherokee registered to TRUJILLO park behind the UCV. Agents determined TRUJILLO was operating the Jeep. His passenger, Christina Ann SILVA-TRUJILLO (TRUJILLO's wife and SILVA's daughter) remained in the Jeep while TRUJILLO exited the Jeep and entered the UCV.

17.    During the meeting, CS-2 and TRUJILLO again discussed pricing for methamphetamine and cocaine. TRUJILLO stated he could likely provide 10 pounds of methamphetamine that same day for $850 per pound and multiple kilograms of cocaine at a later time for $18,000 per kilogram. However, TRUJILLO provided no samples. TRUJILLO also stated he would try to get the 10 pounds of methamphetamine later that day but ultimately the deal went forward on August 25, 2022, as discussed below.

18.    Toll records reflect that TRUJILLO immediately called SILVA after the dry meet. Investigators conducted surveillance and observed him travel to SILVA's place of employment, Food-4-Less, 5975 University Avenue, San Diego, California. There, investigators observed him park and saw SILVA and TRUJILLO conversing.

### August 25, 2022: Sale of 10 Pounds of Methamphetamine

19.    On August 25, 2022, beginning at approximately 8:50 a.m., agents met with CS-2 at a predetermined location and equipped CS-2 with audio- and video-recording devices both on CS-2's person and the UCV.  Pursuant to standard procedures, agents performed a search of CS-2's person and the UCV, which yielded negative results.  CS-2 was provided a recording/transmitting device to be used during the meeting with TRUJILLO and traveled to the meet location. CS-2 was continually monitored both

visually and via audio transmitter. CS-2 was provided with $8,500 in cash for the controlled purchase. During the meeting, CS-2 communicated with TRUJILLO a meet location of the Terra Nova Plaza in Chula Vista, and TRUJILLO confirmed and asked CS-2 to park at the Smart and Final.

20.    At approximately 8:35 a.m., investigators established surveillance in and around the Terra Nova Plaza. During surveillance, investigators observed TRUJILLO's Jeep in the parking lot.  At approximately 9:17 a.m., investigators observed CS-2 enter the parking lot and TRUJILLO enter the UCV in the front passenger seat. While in the UCV, TRUJILLO stated the methamphetamine was wrapped in a box in the trunk of his unlocked Jeep, which was parked in the parking lot near Dicks Sporting Goods. CS-2 provided TRUJILLO with the money and TRUJILLO told CS-2 to drive to his unlocked Jeep and pick up the box of methamphetamine. Prior to leaving the UCV, TRUJILLO gave CS-2 a small sample of cocaine and told him/her that was the quality of cocaine he could sell to CS-2 in the future. CS-2 then went to retrieve the narcotics, contained inside a cardboard box, from TRUJILLO's Jeep.



*Box of methamphetamine sold to CS-2 on August 25, 2022.*

21.    After the controlled purchase, investigators met with CS-2 and the UCV was searched for contraband. Investigators seized the box wrapped in wrapping paper and determined that it contained 10 packages having a gross weight of approximately 5.9 kilograms (13.0 pounds). The substance in the packages later tested positive for 4.364 kilograms methamphetamine (actual) at 96% purity.  The cocaine sample tested positive for 1.15 grams cocaine.

## <u>September 2, 2022: Sale of 10 Pounds of Methamphetamine</u>

22.   Following the first methamphetamine purchase, CS-2 and TRUJILLO continued to correspond regarding additional sales, ultimately resulting in TRUJILLO agreeing to sell 7.5 pounds of methamphetamine to CS-2 on September 27, 2022.  On September 27, 2022, beginning at approximately 1:27 p.m., agents met with CS-2 at a predetermined location and equipped CS-2 with audio- and video-recording devices both on CS-2's person and inside the UCV.  Pursuant to standard procedures, agents performed a search of CS-2's person and the UCV, which yielded negative results.

23.   At approximately 2:00 p.m., CS-2 communicated with TRUJILLO to confirm the meet.  TRUJILLO confirmed and said he was on his way to the Terra Nova Plaza in Chula Vista.  Shortly thereafter, CS-2 traveled to the meet location while under agent surveillance.

24.   At approximately 3:18 p.m., CS-2 spoke with TRUJILLO via telephone, advised that he/she was in the parking lot, and directed TRUJILLO to the UCV. At approximately 3:20 p.m., agents observed TRUJILLO park his Jeep next to the UCV and enter the UCV with a large, white plastic bag in hand. TRUJILLO told CS-2 that the packages of methamphetamine were inside the plastic bag and provided the bag to CS-2. CS-2 gave TRUJILLO $8,500. During the sale, TRUJILLO offered to sell 2.5 kilograms of cocaine to CS-2, and told CS-2 he was doing a fentanyl deal the next day and if the deal did not go through, he would have a lot to sell CS-2. TRUJILLO then exited the UCV, departed the parking lot, and returned to his residence.

25.   After the controlled purchase, investigators met with CS-2 and the UCV was searched for contraband. Investigators seized the plastic bag and determined that it contained 7 packages having a gross weight of approximately 4.180 kilograms (9.22 pounds). The substance in the packages later tested positive for 3.239 kilograms methamphetamine (actual) at 99% purity.

//

//

**September 28, 2022: Distribution of 110,000 M-30 Fentanyl Pills**

26. Separate from the investigation above, a different CS negotiated and purchased fentanyl pills from a Mexican source of supply and TRUJILLO directly, not SILVA. In September 2022, a Mexico-based source of supply gave CS-3[4] TRUJILLO's phone number. On or about September 21, 2022, CS-3 arranged a meeting with TRUJILLO at Plaza Las Americas located at 4445 Camino De La Plaza, San Diego, California. Agents met with CS-3 at a predetermined location and equipped CS-3 with audio- and video-recording devices both on CS-3's person and inside the UCV. Pursuant to standard procedures, agents performed a search of CS-3's person and the UCV, which yielded negative results. CS-3 was continually monitored both visually and via audio transmitter as he traveled to the meet location.

27. Once at the location, investigators observed TRUJILLO enter the UCV to discuss a future narcotics purchase. During this meeting, TRUJILLO and CS-3 discussed the purchase of narcotics and agreed for TRUJILLO to sell CS-3 approximately 110,000 M-30 fentanyl pills and 50 pounds of methamphetamine on or about September 28, 2022. After approximately 10 minutes, TRUJILLO exited the UCV and picked up his wife, SILVA-TRUJILLO, from another area of the shopping center. Investigators then observed TRUJILLO and SILVA-TRUJILLO drive to two other locations then return to their residence.

28. On September 28, 2022, CS-3 communicated with the Mexican source of supply to arrange the meet, and confirmed the meeting time and location. At approximately

---

[4] CS-3 has been cooperating with DEA since June 2014. CS-3 has been cooperating for monetary gain. Additionally, CS-3 received multiple Significant Public Parole Benefits, at DEA's request, through the approval of the Homeland Security Department, which allowed him to be in the United States on a yearly basis, between 2014 and late 2022. Since October 2022, CS-3 has been on a Deferred Action benefit, which allows CS-3 to stay in the United States. CS-3 also has received a work permit, at DEA's request, for the calendar year of October 2018 until the present time. CS-3 has been involved in over 100 controlled purchases, arrests, and/or search warrant operations in which CS-3's observations and information were relied upon by investigating officers. Investigators are not aware of any time during CS-3's cooperation with law enforcement when CS-3 has knowingly given false information, and further, much of the information provided by CS-3 has been corroborated. Investigators believe that the information provided by CS-3 is credible and reliable. CS-3 was convicted for felony importation of marijuana in approximately 1993.

11:45 a.m., CS-3 sent a message via WhatsApp to TRUJILLO, and TRUJILLO immediately called CS-3 and confirmed the deal. At approximately 12:35 p.m., CS-3 provided the meet location of the Sam's Club located at 6336 College Grove Way, San Diego, California to the source of supply and TRUJILLO.   The source of supply subsequently confirmed that TRUJILLO would only sell the fentanyl pills to CS-3, not the methamphetamine. At approximately 12:58 p.m., the source of supply messaged CS-3 a 9-second video showing a cardboard box containing what appeared to be approximately eleven vacuum sealed bags containing blue colored pills, consistent with the appearance of M-30 fentanyl pills. The video displays a hand moving the bags of pills around to display the contents.



*Screenshot from video sent by source of supply to CS-3 showing the M-30 fentanyl pills.*

29.   Investigators met with CS-3 and provided him/her a recording/transmitting device to be used during the meeting with TRUJILLO. CS-3 was continually monitored both visually and via audio transmitter.

30.   At approximately 1:01 p.m., officers surveilling TRUJILLO's apartment observed TRUJILLO place a cardboard box—consistent in appearance with the box from the 9-second video—in a Volkswagen sedan registered to SILVA and drive the Volkswagen to the Sam's Club parking lot.  Officers also observed Isaac Macias TORRES drive TRUJILLO's Jeep from the residence to the Sam's Club parking lot around the same time.

31.   At approximately 1:27 p.m., investigators observed TRUJILLO exit the Volkswagen and enter the front passenger side of the UCV. Investigators observed CS-3

drive TRUJILLO to a secondary UCV, to show TRUJILLO the money. While there, CS-3 and TRUJILLO exited the UCV and approached the passenger side of a secondary UCV where an undercover agent flashed $150,000 USD to TRUJILLO. Moments later, CS-3 and TRUJILLO returned to the UCV and drove back to the Sam's Club parking lot, where officers arrested TRUJILLO from the UCV and TORRES from TRUJILLO's vehicle. Subsequently, agents observed a cardboard box—consistent in appearance with the box from the 9-second video and the box placed in the Volkswagen by TRUJILLO— visible in the back seat of the Volkswagen. Agents seized the box, which contained eleven vacuum sealed bags with approximately 110,000 M-30 fentanyl pills. The 110,000 M-30 fentanyl pills had a gross weight of approximately 12.84 kilograms (28.31 pounds).



*Box of 110,000 M-30 fentanyl pills seized from the back seat of the Volkswagen.*

43.     Both TRUJILLO and TORRES were charged with distribution of fentanyl. On January 20, 2023, the United States moved to dismiss the charges against TORRES and TRUJILLO in light of the investigation into SILVA and TRUJILLO, and their greater drug distribution network. ECF No. 41. The Court dismissed the charges against TORRES and TRUJILLO without prejudice on January 23, 2023.

44.     After the arrest of TRUJILLO, CS-1 was advised that both SILVA and TRUJILLO believed CS-2 had something to do with TRUJILLO's arrest. Therefore, SILVA decided that she would no longer communicate with CS-2. As such, CS-2 was unable to successfully contact SILVA or TRUJILLO. Additionally, following CS-1's

medical illness and ultimate death, the investigation into SILVA and TRUJILLO's greater drug distribution network could no longer advance further, and indictments were sought for both SILVA and TRUJILLO.

45.     On May 23, 2024, the Grand Jury returned a four-count indictment, charging: (1) conspiracy to distribute methamphetamine, in violation of Title 21 U.S.C. Sections 841(a)(1) and 846 (SILVA and TRUJILLO), (2) and (3) distribution of methamphetamine in violation of Title 21 U.S.C. Sections 841(a)(1) (SILVA and TRUJILLO), and (4) possession with the intent to distribute fentanyl in violation of Title 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(B) (TRUJILLO). *See* 24-CR-1070-CAB.  The Honorable Judge David D. Leshner with the United States District Court Southern District of California issued an arrest warrant for SILVA and TRUJILLO.

46.     On June 10, 2024, DEA agents arrest SILVA in San Diego, California. SILVA was in possession of the Target Device 1, and advised the phone number was 619-227-1772.

47.     On July 11, 2024, DEA agents arrest TRUJILLO in San Bernardino, California. TRUJILLO was in possession of the Target Device 2, and advised the phone number was 619-701-7811.

48.     Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the **Target Devices**.  In light of the above facts and my experience and training, there is probable cause to believe that SILVA and TRUJILLO were using the **Target Devices** to communicate with others to further the distribution and/or importation of illicit narcotics into the United States.  Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug distribution and/or importation event in the days and weeks prior to an event.  Co-conspirators are also often unaware of a defendant's arrest and will continue

to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics.

49.     Based on my training and experience, it is also not unusual for individuals, such as SILVA and TRUJILLO, to attempt to minimize the amount of time they were involved in their distribution and/or smuggling activities, and for the individuals to be involved for weeks and months longer than they claim.  I believe this to be the case with SILVA and TRUJILLO: that they had been involved in narcotic trafficking activity for several months leading up to SILVA's husband, HERNANDEZ's, arrest in April 2022. Moreover, from August 9, 2022, to February 22, 2023, SILVA (using x1772, associated with Target Device 1) placed and/or received a total of approximately 313 calls to and from telephone number (619) 288-0900, used by TRUJILLO and subscribed to TRUJILLO's wife, SILVA-TRUJILLO. Notably, as referenced above, TRUJILLO was arrested on or about September 28, 2022, after delivering approximately 110,000 M-30s (containing fentanyl) to a confidential source, CS-3. At that time, a telephone bearing telephone number (619) 288-0900 was seized from TRUJILLO. As stated above, charges in that case were subsequently dismissed, and on or about January 27, 2023, TRUJILLO was released from a sober living facility where he had been ordered to live while on bond. Calls to/from telephone number (619) 288-0900 resumed on or about January 28, 2023, i.e., the date after his release. Based on my training and experience and the investigation to date, I believe that SILVA and TRUJILLO resumed communications regarding their narcotics trafficking and related illicit activities after TRUJILLO's release in February 2023, and that evidence of those activities will be found on the Target Devices. Accordingly, I request permission to search the Target Devices for data beginning on April 1, 2022, up to and including March 22, 2023.

## METHODOLOGY

50.     It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be

simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

51. Following the issuance of this warrant, I will collect the Target Devices and subject them to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

52. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

//

//

1

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

2      53.     Law enforcement has not previously attempted to obtain the evidence sought

3   by this warrant.

4                                ### CONCLUSION

5      54.     Based on the facts and information set forth above, I submit there is probable

6   cause to believe that a search of the Target Devices will yield evidence of SILVA's and

7   TRUJILLO's violations of Title 21, United States Code, Sections 841(a)(1), 843(b), 846,

8   952, 960, 963 and Title 18, United States Code, and Sections 1956-1957.  Accordingly, I

9   request that the Court issue warrants authorizing law enforcement to search the items

10  described in Attachment A, and seize the items listed in Attachment B using the above-

11  described methodology.

12

13  I swear the foregoing is true and correct to the best of my knowledge and belief.

14

15                              *Jonathan Corrao*
                              _____

16                              Jonathan Corrao, Task Force Officer
                                Drug Enforcement Administration

17

18  Sworn and attested to under oath by telephone, in accordance with Federal Rule of
    Criminal Procedure 4.1, this __13__ day of September, 2023.

19

20  *Benjamin Cheeks*

21  _____
    Honorable Benjamin Cheeks

22  United States Magistrate Judge

23

24

25

26

27

28